VICTOR D. ROSSI ET AL., Respondents, v. THERESA R. DAVIS ET AL., Defendants, FRANK R. DALLAVALLE, Appellant.

VICTOR D. ROSSI ET AL., Respondents, v. THERESA R. DAVIS ET AL., Defendants, FRANK R. DALLAVALLE, Guardian, etc., Appellant.

VICTOR D. ROSSI ET AL., Respondents, v. THERESA R. DAVIS ET AL., Defendants, CLARA R. DALLAVALLE, Appellant.

VICTOR D. ROSSI ET AL., Respondents, v. THERESA R. DAVIS ET AL., Defendants, WALTER T. DAVIS, Appellant.

VICTOR D. ROSSI ET AL., Respondents, v. THERESA R. DAVIS ET AL., Defendants, THERESA R. DAVIS, Appellant.

VICTOR D. ROSSI ET AL., Respondents, v. THERESA R. DAVIS ET AL., Defendants, THERESA R. DAVIS, Guardian, etc., Appellant.— 133 S. W. (2d) 363.

Division Two, November 22, 1939.

*Jones, Hocker, Gladney & Grand* for Theresa R. Davis, Walter T. Davis and Theresa R. Davis as guardian of her minor children.

*Edwards, Metcalf & Strong* for Clara R. Dallavalle, Frank R. Dallavalle and Frank R. Dallavalle, guardian, etc.

*Polk & Williams* for Marie Rossi, Stanley A. Rossi, Elvira Rossi, Ida Rossi, Lillian Rossi, John B. Rossi, James F. Rossi, George W. Peters, Sophia R. Peters and Harold E. Johnson.

*Foristel, Mudd, Blair & Habenicht* and *Cox, Blair, Kooreman & Wallach* for trustees.

COOLEY, C.—The action out of which the six above entitled appeals grew was instituted in the Circuit Court of the City of St. Louis by Victor D. Rossi and Mae R. Haseman, plaintiffs, trustees of Simon D. Rossi (now deceased), under a trust instrument executed by the latter. Plaintiffs are children of said Simon D. Rossi and are the trustees named by him in said trust instrument. They accepted the trust, qualified and are so acting. The defendants are the other children of said Simon D. Rossi and a grandson, son of a deceased daughter, named beneficiaries, and other grandchildren, potential beneficiaries in the trust instrument. The plaintiff trustees by their petition sought the direction of the court as to certain questions relating to the administration of the trust. From the court's decree six separate appeals were taken by various defendants. They appear here as separate cases as indicated by the caption, but are in fact separate appeals in one case and were heard together and will be disposed of in one opinion.

Simon D. Rossi, a citizen of St. Louis, whom we shall refer to as the trustor, was an able and successful business man and accumulated a large amount of property, consisting of several valuable pieces of real estate in St. Louis and stock of a corporation known as the S. D. Rossi Grocery Company. He had a family consisting of his wife, Madeline, and ten living children. There was also a grandson, Harold Johnson, only descendant of a deceased daughter. Several of his children were married and had children who, along with their parents, were made parties hereto.

Several years prior to his death said Simon D. Rossi formed a corporation under the name of S. D. Rossi, Incorporated, to which he transferred all his real estate, substantially all the property he owned except his stock in the S. D. Rossi Grocery Company. He executed the trust instrument here involved, on January 10th, 1922, whereby he conveyed to his son, Victor D. Rossi, and his daughter, Mae R. Haseman, as trustees, the stock of S. D. Rossi, Incorporated, evidenced by one certificate, No. 1, in his name, for 3998 shares,

one, No. 2, for one share in the name of Victor D. Rossi and another, No. 3, for one share in the name of Mae R. Haseman, the latter two being endorsed in blank by the nominal holders, all being of the par value of $100 each, aggregating $400,000. The trust instrument provided that the trustor might thereafter add to the trust estate other property, to be held on the same trust, which he thereafter did by transferring to the trustees his stock in the S. D. Rossi Grocery Company, which left him with substantially no property in his own name. By the trust instrument he reserved the right to direct the voting of the stock of S. D. Rossi, Inc., during his life, which right he exercised. There is no contention, nor can there be under the evidence, that Rossi was not of sound mind and free from undue influence when he executed said trust instrument. It was executed by him after long and careful consideration and consultation with able legal counsel. It is not to be doubted that it expressed his definite and well considered wishes. It named as parties of the second part his son and daughter, Victor and Mae, trustees, and as parties of the third part his wife, Madeline, his children and his grandson, Harold Johnson. It provided, generally speaking, for payment of *the income* from the trust estate to the *parties of the third part* and successively to the descendants if any, of such of the children or grandson, Harold, as should die until the death of the last survivor of said *parties of the third part,* whereupon the corpus of the trust estate then in the hands of the trustees was to vest in the then living male children of trustor's sons, Victor D. and Harvey J. Rossi. Provision was also made that on the death of any of said *third parties* leaving surviving him or her a spouse, but no descendants, one-half of the income which the person so dying would have been entitled to if living should be paid to said surviving spouse so long as he or she lived and remained unmarried. Provision was also made for payment of certain specific sums, out of income, upon trustor's death, to certain charitable organizations (not here in controversy), and certain sums, during her lifetime, to trustor's widow, Madeline Rossi (also not here in controversy). The trust instrument is long and is set out in full in Davis v. Rossi et al., 326 Mo. 911, 34 S. W. (2d) 8, to which we shall have occasion to refer hereinafter and to which the reader is referred. We shall make such further reference herein to said trust instrument as may be deemed necessary.

The trust instrument contained the following "no contest" clause: "Should any of the parties of the third part, or any one for them, or any of them, institute any action or proceedings of any kind in any court at any time for the purpose of setting aside this instrument, on any ground whatsoever, and be unsuccessful therein, then and in such event said parties of the second part shall pay to each party of the third part instituting such proceeding or directing or

assisting in the institution or prosecution of such proceeding, the sum of One Dollar, and all further interest of such party or parties of the third part, or his children and descendants in the property conveyed hereby, and the income thereof, shall cease and in the distribution of the income from said property and the property itself, such party or parties of the third part and his or her children shall not share further, and the share of such party or parties of the third part and their children and descendants shall be paid, assigned, transferred and conveyed by the parties of the second part to the other parties of the third part, excepting said Madeline Rossi, or their children and descendants, in equal parts share and share (alike?), as and when distribution of the portion of said income and property to be paid or distributed to them respectively shall be paid and distributed.''

Simon D. Rossi died in December, 1925, leaving no debts or creditors and, so far as shown by the record herein, no property subject to administration, if said trust instrument is valid. Shortly after his death there was a meeting of his children at which the trust instrument was read. Theresa R. Davis, daughter, and one of the appellants herein, expressed dissatisfaction with the trust instrument and made statements indicative of an intention to ''break'' it, or to have it adjudged invalid. Such sentiments were expressed by her on several occasions. It does not appear that she believed or had grounds for belief that her father possessed property at his death subject to administration if the trust instrument was valid. She procured herself to be appointed by the probate court as administratrix of her father's estate and, purportedly in that capacity, instituted in the probate court a proceeding to discover assets of Simon D. Rossi, under Section 63, Revised Statutes 1929 (Mo. Stat. Ann., p. 38). Without going into detail it is sufficient here to say that in said proceeding the only ''assets'' or property supposed or claimed to have belonged to Simon D. Rossi at his death were the shares of stock of S. D. Rossi, Inc., and of the S. D. Rossi Grocery Company, all of which said Rossi had transferred to his said trustees prior to his death, if said trust instrument was valid. In essence and effect said proceeding to discover assets attacked the validity of said trust instrument and sought to recover from the trustees therein named the property—shares of stock—which had been conveyed thereby and pursuant thereto to said trustees, and no other property or assets. In that proceeding the validity of said trust instrument was attacked on the following grounds:

''The administratrix challenges the validity of the deed of trust on the grounds, first, that it was not executed with the intention of creating a bona-fide trust, but for the purpose of evading the State inheritance tax and the statutes relating to wills and the administration of estates; second, that its terms and conditions and the acts

of the parties in connection therewith do not meet the requirements of the law for the creation of a completely executed trust; third, that it is testamentary in character, and, fourth, that it violates the rule against perpetuities. And she further contends that there is a failure of proof of the alleged assignment of the 120 shares of the stock of S. D. Rossi Grocery Company.''

[Davis v. Rossi, supra, 326 Mo. l. c. 936, 34 S. W. (2d) 17.] The probate court sustained said administratrix' claim, seemingly treating the trust instrument as invalid, and ordered said trustees to deliver the stock to said administratrix for administration and distribution as property of said Simon D. Rossi. The trustees appealed to the circuit court, where they prevailed, that court holding the trust instrument valid and that the property belonged to the trustees to be held and handled by them as provided in the trust instrument. On appeal to this court by the administratrix the judgment of the circuit court sustaining the validity of the trust instrument was affirmed in Davis v. Rossi, supra. The present action followed. In it the plaintiff trustees asked the court to adjudge and direct them, among other things, whether Theresa R. Davis had violated the ''no contest'' clause and thus forfeited the share of the income otherwise payable to her or in event of her death to her children or surviving husband; whether her husband had aided and abetted her in such contest, if a contest; and also whether Clara Dallavalle, another daughter, had incurred like forfeiture by aiding and abetting said Theresa R. Davis. The circuit court found in favor of Clara Dallavale on that issue and there was no appeal from that portion of the judgment. The Dallavalle appeal herein is from the court's finding and judgment on another issue, the facts relative to which will be stated later. The court found and adjudged that Theresa R. Davis had violated the ''no contest'' clause, that her husband, William T. Davis, had aided and abetted here therein, and that they ''and those who might take under them'' (the children of Theresa R. Davis) were therefore barred from participation in the income from the trust estate. From that part of the judgment Theresa R. Davis and her husband, for themselves, and Theresa R. Davis as guardian for her children (minors), appealed. We shall refer to these appeals as the Davis appeals and shall consider them first.

The circuit court found that Mrs. Davis sought and procured her appointment as administratrix and instituted the proceeding in the probate court with intent and for the purpose of assailing the trust instrument and having it declared invalid and that her husband aided and abetted her in that purpose. The evidence justified such finding, and the further finding of the court that Mrs. Davis and her husband knew of the trust instrument and knew there was no property subject to administration to be discovered if said trust instrument was valid. Two questions arise:—Is the ''no contest'' provision

valid and enforceable, and if so, was there a contest or attempt to set aside the trust instrument so as to work a forfeiture?

We have not been cited to a case involving a similar provision in a trust instrument *inter vivos* such as we have here but both sides cite cases wherein similar provisions in wills have been construed. The parties seem to concede that the same principles apply and we shall so treat the question.

Forfeiture provisions of the character in question in wills have generally been held by the courts of this country to be valid and enforceable as against the contention that they are contrary to public policy. This court, en banc, so held in In re Chambers' Estate, 322 Mo. 1086, 18 S. W. (2d) 30, 67 A. L. R. 41, holding such a provision valid and not against public policy. But there seems to be considerable difference of judicial opinion as to whether or not an exception should be allowed to the rule, or, perhaps more accurately speaking, in applying the rule and enforcing the forfeiture, where there appears to have been probable cause for the contest. Some courts, we believe the majority which have definitely decided the exact point where it was an issue, have refused to allow an exception on the ground of probable cause where the testator had made none; others have taken the view that an exception should be allowed and the forfeiture denied where it appeared the contest, though unsuccessful, had been made in good faith and on probable cause. Some courts also have made a distinction between cases where there was no gift over of the legacy in question and cases in which there was a gift over of such legacy to another in case of violation of the "no contest" clause, holding the "no contest" provision in the former situation to be *in terrorem* merely and not really intended to visit upon the offending legatee the grave consequences of forfeiture, while upholding and enforcing the forfeiture and the gift over where there is such further disposition of the property. This latter distinction is mentioned and the reasons referred to in In re Chambers' Estate, supra, but we need not here consider it because in this case there was a clearly expressed gift over. The conflicting views are suggested in In re Chambers' Estate, supra. In that case one Chambers had made a will in which he left certain property in trust for a son, and which will contained the following provision, 322 Mo. l. c. 1090, 18 S. W. (2d) 30:

"Fifth. If any devisee, legatee or beneficiary under this, my will, shall contest the validity or object to the probate of this instrument or attempt to vacate the same or to alter or change any of the provisions hereof such person shall be thereby deprived of all beneficial interest thereunder and of any share in my estate, and the share of such person shall become a part of my residuary estate, and such person shall be excluded from taking any part of such residuary es-

tate, and the same shall be divided among the other persons entitled to take such residuary estate.''

The son contested the will, alleging that the testator was of unsound mind and incapable of making a will and that the purported will was procured by undue influence. He lost in the circuit court and appealed to this court. On the appeal this court affirmed the judgment, Chambers v. Chambers, 297 Mo. 512, 249 S. W. 415. We there said that there was no evidence of undue influence but that there was evidence pro and con upon the issue of testamentary capacity, and we discussed that evidence to some extent, holding in effect that it made a question for the jury. In In re Chambers' Estate, supra, the question was whether the son, by contesting his father's will, had forfeited the provision therein made for him. We held that he had. We there said, 322 Mo. l. c. 1091, 18 S. W. (2d) l. c. 31:

''The issues as framed by the respective counsel run as follows: Counsel for appellant insist that the forfeiture provision is invalid, but, alternatively, further insist, that although a provision may be valid in a general sense, yet, that in reason and authority, and upon grounds of public policy, an exception is to be made where reasonable grounds of contest appear; and, that under the evidence appellant is within that exception. Counsel for respondents on the other hand contend that in reason and under the weight of authority the provision is valid, and admits of no exception; but, that even if the asserted exception is one which may be considered, the evidence fails to show that appellant is within such exception.

''A reading of the decisions and the reasons advanced suggests the thought that a judicial opinion can be constructed on either side of the controversy, well supported by authority, and apparently supported by reason. Counsel for appellant insist that it is contrary to the public policy of any state to deny access to the courts for redress or remedy for any wrong, or for the protection of any right, and cite Sections 10 and 30 of Article II, Section 1 of Article VI, of the State Constitution, and Section 1 of Article XIV of the Amendments to the Constitution of the United States; also the Statute of Descents and Distributions, and the Statute of Wills.''

We held in In re Chambers' Estate that said provision was not violative of any constitutional provision and, as above said, that it was not against public policy. In that case we referred to and considered a number of cases from various jurisdictions bearing upon the question of whether or not an exception should be allowed where it appeared there had been probable cause for the contest. Most of them are cited in the instant case. We refer the reader to that decision for discussion of cases which we may not herein specifically refer to.

In Smithsonian Institution v. Meech, 169 U. S. 398, l. c. 412, the court said:

"The language here used is that 'these bequests are all made upon the condition that the legatees acquiesce in this will, and I hereby bequeath the share or shares of any disputing this will to the residuary legatee hereinafter named.' In other words, acquiescence in the will as a will, and in all its provisions, is the condition upon which the legatees can take their bequests. It is not confined to mere acquiescence in his selection of the residuary legatee, but in his declaration as to the title to any named property and his devise of that property. No legatee is to receive a bequest who shall controvert that which he has stated to be a fact, or attempted to prevent that specific disposition of any property which he has made. And in case of a failure to comply with this condition the bequest is given over to the residuary legatee. The authorities fully warrant this conclusion.

" 'When legacies are given to persons upon conditions not to dispute the validity of, or the dispositions in wills or testaments, the conditions are not in general obligatory, but only *in terrorem.* If, therefore, there exists *probabilis causa litigandi,* the non-observance of the conditions will not be forfeitures. [Powell v. Morgan, 2 Vern. 90; Morris v. Burroughs, 1 Atk. 404; Loyd v. Spillet, 3 P. Wms. 344.] The reason seems to be this: A court of equity does not consider that the testator meant such a clause to determine his bounty, if the legatee resorted to such a tribunal to ascertain doubtful rights under the wills, or how far his other interests might be affected by it; but merely to guard against vexatious litigation.

" 'But when the acquiscence of the legatee appears to be a material ingredient in the gift, which is made to determine upon his controverting the will or any of its provisions, and in either of those events the legacy is given over to another person, the restriction no longer continues a condition *in terrorem,* but assumes the character of a conditional limitation. The bequest is only *quousque,* the legatee shall refrain from disturbing the will; and, if he controvert it, his interest will cease and pass to the other legatee.' [1 Roper on Legacies (2d Am. Ed.), 795; 4th Lond. Ed.]"

The court then referred to other cases and said, 169 U. S. l. c. 415:

"The propositions thus laid down fully commend themselves to our approval. They are good law and good morals. Experience has shown that often after the death of a testator unexpected difficulties arise, technical rules of law are found to have been trespassed upon, contests are commenced wherein not infrequently are brought to light matters of private life that ought never to be made public, and in respect to which the voice of the testator cannot be heard either in explanation or denial, and as a result the manifest intention of the testator is thwarted. It is not strange, in view of this, that testators have desired to secure compliance with their dispositions of property and have sought to incorporate provisions which should operate

most powerfully to accomplish that result. And when a testator declares in his will his several bequests are made upon the condition that the legatees acquiesce in the provisions of his will, the courts wisely hold that no legatee shall without compliance with that condition receive his bounty, or be put in a position to use it in the effort to thwart his expressed purposes.''

Speaking of that case (and others) we said in In re Chambers' Estate, supra, 322 Mo. l. c. 1100, 18 S. W. (2d) l. c. 36:

''Some of the courts have sustained the forfeiture provision regardless of whether there was a gift over, and regardless of the question of probable cause. Others have considered probable cause as a matter which ought to constitute exception. Others, including the Supreme Court of the United States, give effect to the gift over as a *conditional limitation* upon the legacy, taking the view that by violation of the condition under which the legacy was given, the legacy, *ipso facto,* vests in the other designated person, and considering also that the condition annexed, is 'a material ingredient in the legacy.' ''

The reason for holding such provisions in a will enforceable, without exception for probable cause, are so well stated in Rudd v. Searles, 262 Mass. 490, 160 N. E. 882, 56 A. L. R. 1548, that we quote therefrom *in extenso.* The court reviewed a number of decisions on the point and said, 262 Mass. l. c. 495:

'' 'Upon principle, it is to be observed that the prohibition cannot be absolute, and can be invoked only where the validity of a will has been unsuccessfully contested. If there be a clear and patent defect in the formalities attending the execution of the instrument, or if the incapacity of the alleged testator be clear and notorious, the heirs or other parties interested will, of course, contest the will, and, contesting it successfully, will set it aside with the clause of forfeiture. On the other hand, it is not easy to see why a testator may not protect his estate and representatives against unsuccessful attempts to litigate his will, by saying to a legatee, ''I, being master of my own bounty, and free to give or to withhold, give you this legacy subject to the condition that you do not dispute the general disposition of my estate. You may contest the validity of my will if you please; but will do so at the peril of losing, if it be established, what it gives you.'' ' Upon authority the court held that the whole law in England upon the subject had been considered and put upon a sound foundation by the Court of Exchequer in Cooke v. Turner, 15 M. & W. 727, to the effect that such a clause was valid. In both these cases apparently there was probable cause to contest the allowance of the will. The result of these decisions appears plainly to be that a clause of forfeiture by legatee or devisee upon contest of the will with gift over is valid under the English law, even though the contest be made upon probable cause.''

The court then reviewed a number of cases, including South Norwalk

Trust Co. v. St. John, 92 Conn. 168, and In re Friend's Estate, 209 Pa. 442, 68 L. R. A. 447 (the latter case cited herein by appellant), which held that an exception to the rule should be allowed for probable cause, and quoted from said South Norfolk Trust Co. case (which suggests the theory on which said exception is based by courts allowing it), as follows, 262 Mass. l. c. 498:

"This exception has been founded in general on the theory that a forfeiture in such case would be contrary to public policy. It is expressed as strongly as anywhere in South Norwalk Trust Co. v. St. John, 92 Conn. 168, at pages 176, 177: 'The exception that a contest for which there is a reasonable ground will not work a forfeiture, stands upon better ground. It is quite likely true that the authorities of greater number refuse to accept this exception, but we think it has behind it the better reason. It rests upon a sound public policy. The law prescribes who may make a will and how it shall be made; that it must be executed in a named mode, by a person having testamentary capacity and acting freely, and not under undue influence. The law is vitally interested in having property transmitted by will under these conditions, and none others. Courts cannot know whether a will, good on its face, was made in conformity to statutory requirements, whether the testator was of sound mind, and whether the will was the product of undue influence, unless these matters were presented in court; and those only who have an interest in the will have the disposition to lay the facts before the court. If they are forced to remain silent, upon penalty of forfeiture of a legacy or devise given them by the will, the court will be prevented by the command of the testator from ascertaining the truth; and the devolution of property will be had in a manner against both statutory and common law. Courts exist to ascertain the truth and to apply the law to it in any given situation; and a right of devolution which enables a testator to shut the door of truth and prevent the observance of the law, is a mistaken public policy.' "

The Massachusetts court then refers to other decisions allowing the exception and concludes, 262 Mass. l. c. 499:

"We are of opinion that sounder reason supports the view that the general power to make a will is not subject to the exception that a testamentary provision is void, to the effect that the opposition to the allowance of the will undertaken upon probable cause by a beneficiary shall cause forfeiture of the testamentary provisions in favor of such contesting beneficiary where there is a gift over upon such forfeiture. It is universally conceded that a condition in a testamentary gift against contest of the will is not inherently bad. There is nothing contrary to public policy in such a provision standing alone. It is only when such contest is instituted upon probable cause by one having an honest belief in his cause that it is thought, in the group of decisions last cited, that a public policy springs up

to create an exception in order to prevent the forfeiture. Manifestly such an exception violates the deliberately expressed purpose of the testator. Such a clause can in no event become effective until the will has been duly approved and allowed. To establish such an exception would also deprive the donee of the gift over in case of contest by the first named beneficiary. Thus in a double aspect it would accomplish a result contrary to the matured desire of the testator. Such a clause does not prevent a contest by the beneficiary under the will. . . . The beneficiary has the option, either to receive the gift under the will, or undertake a contest of the will. He can exercise his election. The moral effect of such a clause would be manifest only in instances where the gift of a substantial part of the estate is made dependent on such a condition of which the beneficiary might be deprived by making an unsuccessful contest over the allowance of the will. Such a clause can be operative only in comparatively few cases. If the contest is successful, that clause falls with the rest of the will. Public and private benefits may flow from the operation of such a clause. Contests over the allowance of wills frequently, if not invariably, result in minute examination into the habits, manners, beliefs, conduct, idiosyncrasies, and all the essentially private and personal affairs of the testator, when he is not alive and cannot explain what may without explanation be given a sinister appearance. To most persons such exposure to publicity of their own personality is distasteful, if not abhorrent. The ease with which plausible contentions as to mental unsoundness may be supported by some evidence is also a factor which well may be in the mind of a testator in determining to insert such a clause in his will. Nothing in the law or in public policy, as we understand it, requires the denial of solace of that nature to one making a will. A will contest not infrequently engenders animosities and arouses hostilities among the kinsfolk of the testator, which may never be put to rest and which contribute to general unhappiness. Moreover, suspicions or beliefs in personal insanity, mental weakness, eccentricities, pernicious habits, or other old characteristics centering in or radiating from the testator, may bring his family into evil repute and adversely affect the standing in the community of its members. Thus a will contest may bring sorrow and suffering to many concerned. A clause of this nature may contribute to the fair reputation of the dead and to the peace and harmony of the living. Giving due weight to all these considerations, we are unable to bring our minds to the conviction that public policy requires that a testamentary clause such as here is involved be stamped as unlawful, even if the contestant had good grounds for opposing the allowance of the will. It seems to us that, both on principle and by the weight of authority, this is the right result."

For other cases denying the exception for probable cause see:

Schiffer v. Brenton, 247 Mich. 512, 226 N. W. 253; Moran v. Moran, 144 Iowa, 451, 123 N. W. 202, 30 L. R. A. (N. S.) 898; In re Estate of Miller, 156 Cal. 119, 103 Pac. 842, 23 L. R. A. (N. S.) 868; Bradford v. Bradford, 19 Ohio St. 546, 2 Am. Rep. 419; Bender v. Bateman, 33 Ohio App. 66; In re Kitchen, 192 Cal. 384, 220 Pac. 301, 30 A. L. R. 1008. See, also, Donegan v. Wade, 70 Ala. 501; Hoit v. Hoit, 42 N. J. Eq. 388. For the opposite view, allowing the exception, in addition to the South Norwalk Trust Co. case and In re Friend's Estate referred to above see: Tate v. Camp, 147 Tenn. 137, 245 S. W. 839, 26 A. L. R. 755; Re Keenan (Wis.), 205 N. W. 1001, 42 A. L. R. 836.

It seems to the writer not quite clear whether or not this court, in In re Chambers' Estate, supra, meant distinctly to hold that probable cause for contest did not constitute an exception and relieve from the forfeiture, but such seems to me to be the necessary effect of the decision. The court said, 322 Mo. l. c. 1101, 18 S. W. (2d) 30, "Under the view we take, it is not necessary to go into a discussion of the question of probable cause, under the evidence introduced to sustain and to combat the will." But the court had already referred to decisions pro and con on that question, pointing out the divergent views of different courts, had pointed out that there was a gift over (as there is here) of the legacy in question in case of an unsuccessful contest and that "the testator meant to visit that grave consequence (forfeiture) upon him" (the contesting legatee); that the testator had the right to attach to his gift such conditions as he saw fit so long as they were not contrary to public policy or settled rules of law; that the condition, with the gift over, was "a material ingredient in the legacy;" and had also said that, as shown by the opinion in the will contest case, Chambers v. Chambers, supra, while there was no evidence of undue influence there was evidence pro and con on the question of testamentary capacity. And in Chambers v. Chambers, supra, the court, as we have said, treated the evidence on that issue as sufficient to make it a question for the jury. After making the above quoted statement as to non-necessity for "discussion" of the question of probable cause the court pointed out facts shown by the record which tended to show good reason why the testator made, or well may have made, the provision he did make in his will, and concluded thus:

"The legacy was given to appellant to have upon certain terms, and since, as we think, there was no consideration of public policy which required him to dispute the sanity of his father, there is now no consideration of public policy which requires the court to relieve him from the consequences of the choice he made."

Now, since in the Chambers case there was at least sufficient evidence of testamentary incapacity to make that issue a question for the jury, if the court, in In re Chambers' Estate, had considered that

probable cause would relieve from the forfeiture it would seem that question would have received further discussion. I believe the court regarded it as immaterial whether the contesting legatee had probable cause for his contest or not. At any rate the decision certainly cannot be regarded as a holding that probable cause excuses an unsuccessful contest and relieves from the forfeiture.

After careful consideration of the question we are of opinion that the conclusion reached by the Massachusetts court and in other decisions to like effect, as above indicated, is supported by the better reasons and rests upon the sounder logical foundation. It must be conceded that (subject to certain limitations or exceptions not here necessary to consider), a person may dispose of his property as he wishes. A prospective heir has, generally speaking, no vested right in his ancestor's property. If there be a will the legatee or devisee takes thereunder what the will gives him and subject to the conditions thereby imposed. He may contest the will and show, if the can, that it is *not the will* of his ancestor, whereupon the whole purported will falls. But if it be established that it is in fact the ancestor's will then it would seem the will must stand, not in part but *in toto.* One cannot claim under a will and against it at the same time. He takes according to the will, or, so far as concerns the will, not at all. "It is a general principle of law that one cannot claim under a will and against it too, and one who accepts a beneficial interest under a will thereby adopts the whole will and renounces every right or claim that is inconsistent with the will." [In re Bernays' Estate, 344 Mo. 135, 126 S. W. (2d) 209, 216, and cases cited.] In a case such as we have before us the gift is made upon a condition which the courts generally hold is not opposed to public policy or morals nor to established rules of law, with a definite gift over to another in case of violation of the condition. To engraft upon the condition thus distinctly expressed by the maker an exception not expressed nor reasonably implicable from the language of the instrument is to nullify the will of the maker, if in fact it be his will. Whether or not it is in fact his will is a question which any legatee or devisee or beneficiary may submit to the arbitrament of the courts. He is not precluded by the no-contest clause from seeking redress in the courts. The courts are open to him to show, if he can, that the alleged will or instrument is not the will of his ancestor—is not valid—in which case the whole instrument falls. But if it be adjudged to be the will of the maker why should it not be given effect as written, absent some prohibitive rule of public policy or established rule of law? The dissatisfied legatee or beneficiary has his day in court. He may, without legal restraint, submit to the court the question, is the purported instrument in fact the will of the maker? If it be adjudged that it is not, he wins. If it be adjudged that it is, he loses. But every litigant takes and must take the chance to win or lose in a law-

suit. There is no obligation on the part of a disappointed legatee or beneficiary to question the sanity of him from whom the gift comes, —or, we may add, to question whether or not the purported instrument was the product of undue influence. [In re Chambers' Estate, supra.] In Moran v. Moran, supra, 144 Iowa, l. c. 464, we read: "The condition is lawful and one which the testator has a right to annex in the disposition of his own property. The legatees are not bound to accept the bequest, but, if accepted, it must be subject to the disabilities annexed. It must be taken *cum onere,* or not at all."

It seems to the writer that the instant case furnishes a good illustration of the soundness of the rule we have above indicated. There was no evidence in this case, in fact no contention, that Simon D. Rossi was not of sound mind and free from undue influence when he executed the trust instrument here involved. Neither was there any such evidence or such contention in Davis v. Rossi, supra, in which the validity of the instrument was assailed and was sustained. The probate court found for the administratrix in the proceeding to discover assets—upon what theory or on what grounds is not shown. It may have been—must have been—on the theory that the provisions of the trust instrument contravened some principle of law, since there was no substantial evidence of mental incapacity or undue influence—a theory denied by the decision in Davis v. Rossi, supra, which held the trust instrument valid. Appellants argue that the finding of the probate court in favor of the administratrix is at least prima facie proof that there was probable cause for contesting the validity of the trust instrument. Indeed, counsel say that such finding is conclusive proof of the existence of probable cause unless shown to have been improperly induced, and they say it was not so shown. They cite and seek to apply the rule in malicious prosecution cases, such as Randol v. Kline's Inc., 330 Mo. 343, 49 S. W. (2d) 112, and like cases. We express no opinion as to whether or not the fact that the probate court found in favor of the administratrix, holding the trust instrument invalid, amounted technically to a showing of probable cause for contesting the validity of said instrument, because in our opinion, for reasons above stated, it is immaterial whether it did or not. In either event we believe that Mrs. Davis, by contesting the trust instrument, if she did so—a question next to be considered—forfeited the provision therein made for her and (in event of her death) for her husband and children.

Did appellant, Mrs. Davis, violate the no-contest clause of the trust instrument? We think so. It is argued in her behalf that the proceeding brought by her in the probate court was instituted and prosecuted by her *as administratrix* and is not binding upon her *individually,* was not a proceeding by her in her *individual capacity* and not a violation of the no-contest provision of the trust instrument. It is

asserted that "in order to have an estoppel by former judgment four conditions must concur: (1) Identity of the thing sued for; (2) identity of the cause of action; (3) identity of the persons and the parties to the action; and (4) identity of the quality of the person for or against whom the claim is made." Appellants Davis cite on this point: Scheurich v. Empire District Electric Co. (Mo.), 188 S. W. 114; Terrill v. Boulware, 24 Mo. 254; Hospes v. Branch, 134 Mo. 592, 36 S. W. 226; Dibert v. D'Arcy, 248 Mo. 617, 154 S. W. 1116; Womach v. St. Joseph, 201 Mo. 467, 100 S. W. 443; Kirk v. Met. Life Ins. Co., 225 Mo. App. 756, 38 S. W. (2d) 519; Rollins v. Shaner, 316 Mo. 953, 292 S. W. 419; Freeman on Judgments (5 Ed.), sec. 418; 15 R. C. L., pp. 1012-13; and some cases from other jurisdictions. Said appellants also cite State ex rel. St. Joseph Water Co. v. Eastin, 278 Mo. 662, 213 S. W. 59; State ex rel. Blair v. Center Creek Mining Co., 262 Mo. 490, 171 S. W. 356; McKenzie v. Donnell, 208 Mo. 46, 106 S. W. 40; Garland v. Smith, 164 Mo. 1, 64 S. W. 188; and some cases from other jurisdictions. Generally speaking, those cases deal with the question of *res adjudicata* and tend to sustain appellant's contention as to the requisites of estoppel by former judgment. But, recognizing the principle enunciated in the cases cited, we do not believe it applicable or available to appellants in the circumstances of the instant case. The no-contest clause provides that "should any of the parties of the third part (of whom Mrs. Davis was one) . . . institute any action or proceedings of any kind in any court at any time for the purpose of setting aside this instrument, on any ground whatsoever, and be unsuccessful therein . . ." the forfeiture should follow and the portion of income given to such third party or, in event of his or her death, to his or her children or surviving spouse, should go to others. We have pointed out that the evident purpose of the probate court proceeding was to "set aside,"—to have annulled—the trust instrument. To that end and for that purpose Mrs. Davis procured herself to be appointed administratrix and instituted the proceeding in the probate court to "discover assets," there being, as she knew, no assets to discover unless the trust instrument should be held invalid. That proceeding was one in which the ownership of the corporation stock—the only "assets" in question—could appropriately be adjudicated. [See In re Estate of Huffman, 132 Mo. App. 44, 111 S. W. 848.] If the proceeding instituted in the probate court had been successful and the trust instrument adjudged invalid, thus leaving the property in question as assets of the estate of Simon D. Rossi, Mrs. Davis would have shared therein as heir and distributee. She thus not only represented, as administratrix, the Rossi estate and in a way the heirs and distributees, of whom she was one, but, being an heir and distributee, she had a personal, individual interest in having the trust instrument set aside.

In Fouche, Assignee, et al., v. Harison, Executor, et al., 78 Ga. 359, 410, it is said:

"It is contended that when an executor files a bill as executor, he commits himself to nothing in his personal and individual character, that he is not a party otherwise than as representing the estate, and that pending the bill, he may act as freely, touching any individual right or interest involved, as if some other person were the complainant. To this doctrine we are quite unable to assent. On the contrary, as we understand the law, an executor who files a bill in his representative capacity is a party thereto in his individual capacity also, if as an individual he has a manifest interest in the subject-matter of the bill. Thus an executor being a legatee to the extent of the net income of the whole estate during his life, and to the extent of one-fourth of the general residuum, having filed a bill as executor to restrain some of his creditors from proceeding to subject his interest by levy and sale at law, to which bill creditors of the estate, as well as some of his own creditors, are parties defendant, and praying for a decree directing him, in view of the conflicting claims of the defendant, how to administer the estate of his testatrix, and that the defendants establish their priorities and show to what extent they can legally subject assets of the estate to the payment of their claims, is a party complainant, not only as executor, but likewise as legatee and debtor. Can it be supposed that the decree on such a bill would not bind him individually in respect to his legacies, or that as an individual he would not be entitled to take the benefit of the decree in so far as it might redound to his individual interest touching those legacies? Moreover, is it not as much for the protection of the executor as for the advantage of the estate, and often more so, that a court of equity interposes to give direction? Whoever heard that an executor has to make himself a party to his own bill in order to bind himself individually, or to give himself, as creditor, legatee or otherwise, the fruits of the decree to the extent of his personal interest in the same? Is it possible to doubt that on the present bill it would be competent to decree the proper disposition to be made of the legacies, whether to pay them out on the claims of creditors, or to hold them free from such claims? And how could the executor, as an individual, either shun the burden or be shorn of the benefit of any rightful decree on that subject that might be rendered? Unless we are wholly unfit to be judges on such a plain question, we are at a loss to understand why it should be considered a question at all. That no direct authority upon it has been produced must be due alone to the fact that legal evolution has not progressed far enough to develop a needless precedent for a necessary conclusion."

We think the reasoning of the Georgia court is sound and that it is sustained by Corcoran v. Chesapeake & Ohio Canal Co., 94 U. S. 741, 745. See, also, Morton et al. v. Packwood et al., 3 La. Ann. Rep.

167, 171-4; Coerver v. Crescent Lead & Zinc Corp., 315 Mo. 276, 286, et seq., 286 S. W. 3, in which, under the trust instrument there under consideration, *cestuis que trustent* were held bound by a judgment against the trustees. The court said, 315 Mo. l. c. 287:

"The rule followed in Missouri is thus stated in Story on Equity Pleadings (10 Ed.), sec. 150: 'It has been laid down by Lord Redesdale as a general rule, that, where any persons are made trustees for the payment of debts and legacies, they may sustain a suit, either as plaintiffs or as defendants, without bringing before the court the creditors or legatees, for whom they are trustees, which, in many cases, would be impossible. And the rights of the creditors or legatees will be bound by the decision of the court, when fairly obtained for or against the trustees. In such cases, the trustees, *like executors, are supposed to represent the interests of all persons, creditors, or legatees.*'" (Italics ours.)

In the instant case can it be said that, had Mrs. Davis, as administratrix, been successful in the probate court proceeding, it would not have redounded to her benefit as an heir? Would not she, as heir and distributee, have profited the same as other heirs and distributees whom, as administratrix, she represented? And if she, as administratrix, represented the estate and the other heirs and distributees, why did she not thus represent herself as one of such heirs and distributees? In the circumstances shown how could she, either as administratrix or as an individual "either shun the burden or be shorn of the benefit of any rightful decree" rendered in the probate court proceedings? It seems to us the questions answer themselves.

It is urged that even though Mrs. Davis may have violated the no-contest clause the judgment of the circuit court is wrong in holding that her children and her husband are thereby deprived of their possible interest in the income. We cannot sustain this contention. As to the husband the court found that he had abetted and assisted in the institution and prosecution of the contest, a finding which we think supported by the evidence. While he was not named as a "party of the third part" in the trust instrument (Davis v. Rossi, supra), we are inclined to think he is included in the no-contest clause, which provides that "should any of the parties of the third part *or anyone for them*" contest said instrument, such third party instituting such proceeding "or directing or assisting" in the institution or prosecution thereof should forfeit his or her interest. But we need not base our conclusion as to the husband on that theory. Whether the husband is barred on that theory or not we think both he and the children are precluded from further participation in the income under the express terms of the trust instrument, because: said instrument provides that (subject to payments not necessary to notice in this connection) the trustees shall pay the net income to the par-

ties of the third part, in equal proportions "and should any of said parties of the third part die . . . leaving surviving him or her a child or children, or other descendants . . ." the trustees are to pay to such descendants "the share of such income their parent would have received were he or she still living;" and if any of the third parties should die leaving no descendants but a surviving spouse, the trustees should pay to such surviving spouse, so long as he or she remained unmarried, one half of the share of the net income to which such deceased third party would have been entitled had he or she not died. Note, the portion of income to be paid in any event to descendants or surviving spouse of a deceased "party of the third part" is only such income as such party of the third part would be entitled to receive if living. The no-contest clause expressly provides that in case of an unsuccessful contest the share of income that otherwise would have been payable to the contesting party shall be forfeited and "all further interest" of such contesting party "or his children and descendants" shall cease and such share shall go to others named. It is apparent that by the terms of the trust instrument the surviving children, if any, or if none, the surviving spouse, of a named third party are to take only conditionally and only in any event the portion such deceased third party would be entitled to *if living*. Now, if such "third party," whose share alone the surviving children or spouse can take, has forfeited his or her interest and, if living, would be entitled to nothing, how can it be said that the surviving children or spouse can take anything? They are not given a definite or independent bequest upon the death of the deceased third party but only a bequest of what that party would have been entitled to receive while living and until his or her death. If, by reason of the forfeiture, that be nothing, then they are given nothing. The interest given them is derivative and contingent.

It is argued that the no-contest clause should be held void because, it is said, it defeats the dominant purpose of the trust instrument, which, appellants say, is that the corpus of the estate is to vest ultimately in the male children or descendants of Victor and Harvey Rossi. Appellants argue that should Victor or Harvey contest the trust instrument the male descendants of the one (or both) so contesting would be cut off and thus the ultimate and dominating purpose of the trust defeated—wherefore, because in legal contemplation that could happen, the no-contest provision must be held invalid. We do not think that contention can be sustained. The corpus of the estate is not to vest in such "male children or descendants" until all of the "third parties" have died. The trust will thereupon have ceased. The gift to such male children or descendants is not a gift of what their ancestor would have been entitled to but a direct and unqualified gift of the corpus when the trust has terminated. They do not take derivatively or contingently but directly and unconditionally.

*Of the Dallavalle appeals*:

These appeals were taken by Clara Dallavalle and her husband, Frank, for themselves and by the latter as guardian *ad litem* for their infant children. They present questions of certain alleged acts of malfeasance on the part of the trustees for which appellants Dallavalle, and in effect, appellant Theresa R. Davis, ask that the trustees be removed and be compelled to account.

First we shall consider the request made by the trustees in this action to be directed by the court whether the expense (including attorney fees), of the litigation, begun by Theresa R. Davis, ostensibly as administratrix, in the probate court and thereafter prosecuted to the circuit court and to this court, should be paid out of income or out of corpus or in part out of both and, if the latter, in what proportions. Appellants assert that it should all be paid out of the corpus; respondents that it should be paid out of income. The amount of such expenses is not shown, nor whether same was reasonable or not. The question seems to be presented to us as one of law, to be determined by the intent of the trustor as evidenced by the trust instrument. That instrument provides that *out of the income* the trustees shall pay "all taxes of every kind which may be assessed against said property or the income therefrom, and any necessary expenses of administering the trust thereby created, including reasonable compensation to the" . . . (trustees, to be considered hereafter).

Appellants contend that the above indicated expense of the litigation instituted by Theresa R. Davis is an "extraordinary or unusual" expense, not within the contemplation of the trust instrument as being payable out of income, and is chargeable *in toto* against the corpus of the estate. They cite a number of cases from other jurisdictions to the general effect that "extraordinary or unusual expenses" —(including, they contend, the costs of litigation incident to an attack on the validity of the trust instrument), are chargeable to the corpus of the estate, such as: In re Duffill's Estate, 188 Cal. 536, 206 Pac. 42; Cogswell v. Weston, 228 Mass. 219, 117 N. E. 38; In re Gartenlaub's Estate, 185 Cal. 648, 198 Pac. 209; and several cases from N. Y. Supp. reports. We have examined the cases cited but, without taking space to analyze them, we think they are distinguishable in their facts from the case before us. It is not denied—cannot be denied—that the trustees were justified in incurring such reasonable expenses (including attorney fees) as might be necessary in upholding the trust instrument. When they accepted the trust they became bound, we think, to uphold and carry it out, so far as they reasonably could. The rule is thus stated in In re Duffill's Estate, supra, 206 Pac. l. c. 50, quoting from Pomeroy's Eq. Jurisprudence (3 Ed.), section 1085: "The trustee is to be allowed . . . all expenses reasonably necessary for the security, protection and preser-

vation of the trust property, *or for the prevention of a failure of the trust.*'' (Italics the court's in said case.) Of the soundness of that doctrine we think there can be no doubt. The question in the instant case is not whether the expenses in question should be allowed to the trustees but whether they should be charged to income or to the corpus. We think the question must be resolved by reference to the trustor's intent as disclosed by the trust instrument.

That instrument provides that ''all taxes of every kind'' and ''*any necessary expenses of administering the trusts hereby created*'' shall be paid out of income and only *net income* is to be distributed during the life of the trust. The question suggests itself, how can the trust be administered and carried out if it is destroyed? And, therefore, is not an expense necessarily incurred in *preserving* the trust a ''necessary expense of administering the trusts hereby created'' within the purview of the trust instrument? Also, it is to be noted, the only property the trustor conveyed to the trustees *when he executed the trust instrument* was the stock of S. D. Rossi, Inc., which was to be held by his two children, Victor and Mae, named as trustees, with permissible authority to transfer one (qualifying) share to some other person so as to comply with the law requiring the corporation to have three directors, qualified by being stockholders. It is obvious from the trust instrument that the trustor meant that the stock and the control of the corporation he had formed should be kept in trust by those he designated for his designated beneficiaries. He must have anticipated the possibility that someone or more of the named ''third parties'' might contest said trust instrument, else why the no-contest clause? If that should happen court expenses, attorney fees, etc., would necessarily be incurred. This the trustor must have known.

Now, if that should occur (as it did occur) from what source could such necessary expense of defending and preserving the trust be paid, —from what source did the trustor intend it should be paid? When he executed the trust instrument the only property he conveyed to the trustees was the stock of S. D. Rossi, Inc., and the trust instrument clearly evidences an intent that said stock should be kept in and under the control of the Rossi family, through trustor's named children, Victor and Mae. If expenses of defending a possible assault upon the validity of the trust instrument should have to be incurred by the trustees, whence should come the money to pay such expenses? At that time no property or funds had been conveyed to the trustees except said stock and the income therefrom and, as we have said, the trust instrument evidences an intent that said stock was to be kept in the control of the trustees for the benefit of the family. There was at that time no other property or assets of the corpus of the trust estate out of which such expenses could be paid. If they had to be paid out of corpus it would have meant that stock of S. D. Rossi, Inc.,

would have had to be sold, perhaps to outsiders, to raise money to pay them, thus imperiling what we believe was an underlying purpose of the trustor. If paid out of income the trust estate would be kept intact, redounding not alone to the benefit of the ultimate remaindermen but also to that of the life beneficiaries, whose future income would thus be maintained upon the basis of the unimpaired earning value of the corpus. Considering the language and the apparent purpose of the trust instrument and all the circumstances we believe the circuit court was right in holding that said expenses are chargeable to income. We believe this conclusion is supported by the reasoning and conclusion of the court in Melvin v. Hoffman, 290 Mo. 464, 500, 235 S. W. 107, wherein the court (290 Mo. l. c. 500), defined "net income" as the income remaining after paying expenses of the trust including (among other things) "reasonable attorneys' fees . . . in defending this suit, or other litigation to which he may be a party as trustee . . . and all other necessary expenses incurred as such trustee in order to preserve the *corpus* of the trust property intact for the remaindermen as provided for in said deed." The provisions of the trust instrument construed in Melvin v. Hoffman differ from those of the instrument we have before us but we think the definition of "net income" there given is applicable here, keeping in mind the trustor's evident purpose to keep the property conveyed to the trustees—the stock of S. D. Rossi, Inc.—intact and in the control of those whom he designated.

Complaint is made that the trustees have failed to distribute income and have accumulated a large surplus out of earnings which should have been distributed periodically, as earned. A large part of this accumulation came about by reason of the proceeding instituted in the probate court by Theresa R. Davis and the consequent uncertainty of the trustees as to whether or not they could properly or safely distribute income as by the trust instrument directed. Mrs. Davis was attacking the validity of said trust instrument. That litigation did not finally terminate till about December 20, 1930. Being uncertain whether or not said Mrs. Davis had forfeited her interest, and also (because of certain information they had received) whether Mrs. Dallavalle had aided Mrs. Davis in contesting and thus forfeited her interest, the trustees instituted this suit August 1, 1931, seeking the direction of the court, as we think they were entitled to do. Pending these suits considerable undistributed income had accumulated. There appears from the record no disposition on the part of the trustees to withhold any distributable income from the beneficiaries when advised how such distribution should be made. And it may be observed that, except for Mrs. Dallavalle and Mrs. Davis, all the beneficiaries named as third parties in the trust instrument are asking that the circuit court judgment be affirmed. We have held that Mrs. Davis has forfeited her interest. It does not appear

that Mrs. Dallavalle has been prejudiced or will be prejudiced by the failure of the trustees to distribute income periodically during the pendency of this litigation. Neither does it appear that in this matter the trustees acted in bad faith.

Another complaint is that the trustees violated an express provision of the trust instrument in this:

The properties which constituted the basis of the stock valuation of S. D. Rossi, Inc., and which Rossi conveyed to the corporation when he organized it, consisted substantially of several valuable parcels of real estate in St. Louis. One of those properties, on Delmar Boulevard, was not improved with buildings, but, from its location, was valuable and if improved with suitable buildings was capable of producing substantial income. In its then condition it produced a very small income. The taxes against it were high and the net income was practically nothing. In the trust instrument the trustor directed that the corporation should set aside out of its income $5000 per annum "for the purpose of improving with suitable buildings" said Delmar Boulevard property. It did so for several years, until it had thus accumulated in that way a fund (sometimes referred to as sinking fund) of approximately $25,000. That was not sufficient to erect the kind of buildings the trustees thought suitable and for the advantage of the estate. In order to accelerate the erection of a suitable building and the increased rentals (income) thus to be secured the trustees proceeded to and did erect a building costing about $43,000. They used the $25,000 sinking fund which had been accumulated and paid the remaining $18,000 "out of income," but as we understand the evidence such additional sum was paid out of the *increased rentals* received. While it does not seem quite clear whether all of said additional $18,000 had been so returned to the distributable income account at the time of trial it does appear that at least nearly all of it had been and that the balance will be. It was all along the intention of the trustees so to return it. They merely anticipated a part of the improvement fund they were expressly directed to accumulate out of income, using it for the purpose designated, but as to part of it, in advance of the time it had been accumulated. Since the erection of the improvements the property has yielded largely increased revenue, which *increased revenue* had, up to the time of the trial, substantially at least, paid the cost of the improvements over and above the then accumulated "sinking fund" and all of which increased revenue has been and is to be treated by the trustees as income. There can be no doubt that the erection of the improvements, as and when made, has redounded to the benefit of the beneficiaries entitled to the income of the trust estate. Neither can there be any doubt that the trustees acted in good faith in making the improvements as and when they did. Whether or not said trustees, technically, had the right under the trust instrument to use income

in advance or anticipation of its *mandatory* accumulation for the purpose designated in the trust instrument we deem it unnecessary here to decide. The *purpose* for which it was used was one enjoined by the trustor. Only the time of such use can be claimed to have been a violation of the express provisions of the trust instrument and that, we think, under the circumstances, has ceased to be of importance. We find in this matter no sufficient ground for removal of the trustees.

It is contended that the trustees violated their trust and should be removed because they set up and maintained, out of the income, a "depreciation account" or "reserve for depreciation." It appears that up to the time of trustor's death no regular books had been kept. When the trustees took charge after trustor's death, they "set up" books, as of December 1, 1925. They did so with the assistance and according to the instructions of an expert accountant (whose qualifications and honesty are not here questioned). Following the advice of said accountant a "reserve for depreciation" was set up on the books. Victor Rossi testified that at the time of the trial herein the trustees had, as "undistributed depreciation the sum of $75,998.00 minus $8,400.00." He further testified:

"It is not my understanding the sum set up on our books should be withheld from distribution, but it is my understanding that the books should in some way be changed or adjusted so that all of the money which has come in as income should be distributed without any sum being taken off to provide for depreciation. We have never at any time wanted to set up anything to deprive the beneficiaries of their income.

"Of course, this sum set up for depreciation represents a sum being set apart out of income and that is just what we do not want to continue to do."

His testimony on this subject is not disputed. Neither of the trustees desires to withhold said money from distribution as income. In setting up the depreciation account they followed the advice of the accountant. They ask in this proceeding to be advised by the court in regard thereto, such request being included, we think, in the general prayer for instruction on any question regarding which the court might deem it proper, and from the fact that the matter of such depreciation account was made an issue by the pleading of appellant Dallavalle and was heard by the court. The court did not specifically instruct the trustees on this item. On the record before us we agree with the trustees that the sum shown by their books as reserve for depreciation should be distributed as income and that, at least unless some special circumstances should arise calling for it, such reserve out of income for depreciation should not be continued. If in any event a contingency should arise requiring and justifying the use of a portion of income in order to effectuate the

purposes of the trust, keeping in mind the rights and interests of those entitled to the income, that can best be taken care of by appropriate proceedings when and if the necessary facts can be shown. For the present we deem it sufficient to say that this proposition presents no just ground for removal of the trustees.

Another item of alleged misappropriation, on account of which appellants say the trustees should be removed, is this:

Shortly after the death of Simon D. Rossi, all of his children and his widow (named as third parties in the trust instrument), met and had a conference. The trust instrument was read and discussed. Victor Rossi stated that his father had expressed the wish and request that he, Victor, should be paid $5000 for services rendered prior to trustor's death and asked if there was any objection to such payment being made. The weight of the evidence indicates, and the court found, that all agreed that the payment should be made and assented thereto. Harold Johnson, the grandson, named as a third party in the trust instrument, was not present. He was then a minor. The $5000 was paid to Victor Rossi pursuant to that agreement. Harold Johnson became of age prior to the present action, appeared therein, and is now asking that the judgment below be affirmed. The only "party of the third part" complaining of that alleged misappropriation is Clara Dallavalle—and perhaps Theresa R. Davis, who has forfeited her interest. There is some testimony from Clara Dallavalle to the effect that she neither assented to nor dissented from said payment to Victor, but we think the weight of the evidences justifies the court's finding that both she and Mrs. Davis affirmatively assented. We find no just ground of removal of the trustees on account of this payment.

Appellants claim also that the trustees have violated their trust because, as officers of the corporation, they were paid salaries to which appellants say they were not entitled. By the trust instrument the trustor provided that after his death all of the stock of S. D. Rossi, Inc., should be transferred on the books of the corporation to the "second parties" (trustees), except one share which said second parties were authorized to transfer to "a third person to hold for the parties of the second part in order that said corporation may have at least three stockholders." Such qualifying share was transferred to Madeline Rossi (the widow). Naturally those three became the three directors of the corporation and they elected Victor D. Rossi president and Mae R. Haseman secretary of said corporation. By order of said board of directors salaries were fixed for said officers and were paid by the corporation. We do not understand appellants to contend that the salaries were in themselves unreasonable, their contention being that the trustees were not entitled to salaries as officers of the corporation but that their entire compensation, in whatever capacity service was rendered, was limited to the

compensation fixed for them as trustees by the trust instrument, which provides that "out of the income from said property said parties of the second part (trustees) shall first pay all taxes of every kind which may be assessed against said property or the income therefrom and any necessary expenses of administering the trusts hereby created, including reasonable compensation to the parties of the second part for their services, which shall be five (5) per centum of all disbursements made by them. . . ." The property conveyed to the trustees is designated in the trust instrument as "the following described personal property . . . four thousand shares of the capital stock of S. D. Rossi, Incorporated . . ." (being all of the stock). After providing for certain payments to be made out of the *corporation* income (including the $5000 per annum "sinking fund" above mentioned) said trust instrument provides that "the remainder of the net income of said corporation shall be distributed as dividends, out of which *when the same shall be received by the parties of the second part* they shall pay said Madeline Rossi the sums hereinbefore directed to be paid to her, and the balance remaining after such payments they shall pay to the parties of the third part other than Madeline Rossi, as hereinafter provided. Should the terms for which said corporation was incorporated terminate before the termination of the trusts herein created, said parties of the second part shall either extend the corporate existence of said corporation or form a new corporation to take over the property of said corporation, which new corporation shall be conducted in the same manner as said S. D. Rossi, Incorporated, was conducted by the parties of the second part." (Italics ours.)

We think it apparent that the only distributable income which the trustees, as such, receive and which, *as trustees,* they can disburse, is what is turned over to them in the form of dividends by the corporation. It also appears to us that the corporation is not a mere dummy. *As a corporation* it owns and manages the extensive properties forming the basis for its capital stock. It is to be kept alive and functioning as a corporation. It requires much time and labor and good business ability to conduct properly the business and affairs of the corporation. The evidence shows that the two above named officers of the corporation, who are familiar with its property and affairs, spend practically their entire time in attending to the business of the corporation. The five per cent of income disbursable *by the trustees* would be but meager and, we think, inadequate compensation for the time, labor and business ability required to manage the affairs of the corporation. Of course if, as trustees, they are bound to manage and conduct the affairs of the corporation and if the compensation fixed for them as trustees was intended by the trustor, as declared in or reasonably to be understood from the provisions of the trust instrument, to be full compensation for *all* such services, then such trustees must perform the services required for the compensation stipulated

or else decline to serve. Much has been said pro and con in the briefs of learned counsel as to whether or not the trust instrument contemplates that the five per cent therein mentioned was intended to include services to be rendered as officers of the corporation. In the view we take it is not necessary to determine this question in this case, because the corporation is not a party to this proceeding and in order to determine the question and bind the corporation we think the corporation is a necessary party.

We have indicated that the corporation is not a mere dummy organization but a live, going concern, owning and operating the physical properties upon which its capital stock is based, although its stock is owned by the trustees and they constitute the controlling members of the board of directors, yet the corporation is a separate and distinct entity and as such has its duties, obligations and rights.

In 6 Thompson on Corporations (3 Ed.), section 4650, pages 546-7, we read:

"The general rule is that where the purpose of the action is to prevent or redress a wrong to the corporation and the directors or other officers of the corporation refuse to allow the action to proceed in the name of the corporation as plaintiff or whenever their relation to the subject of the action is such that it would be improper for the action to proceed in the name of the corporation as plaintiff, while the corporation should remain under their control, it is indispensable that the corporation should be made a party defendant. In other words the corporation itself is an indispensable party to an action to remedy a wrong which the corporation should have proceeded to remedy itself, and the bill is demurrable if the corporation is not made a party. The failure to make the corporation a party is not a mere defect of parties to be taken advantage of by special demurrer, but leaves the stockholder without a cause of action since the party entitled to the relief is not before the court."

Also, same section, page 549,

"The corporation is a necessary party defendant where the bill is filed against the directors for relief against their breach of trust or that they may be restrained from using the funds and property of the corporation to carry out a breach of trust. The corporation is likewise a necessary party defendant where it is sought to restore to the corporation assets unlawfully converted by the directors or officers to their own use."

[See, also, 3 Fletcher, Enc. Corp., sec. 1313, pp. 820, 821; 13 Fletcher, Enc. Corp., sec. 5997, p. 300; 3 Pomeroy's Equit. Jurisp., sec. 1095; Exter v. Sawyer, 146 Mo. 302, 324-5, 47 S. W. 951; Gruen v. Schaeffer, 7 Mo. App. 587 (Memorandum opinion).] If the corporation has wrongfully been induced to pay out money it should not have paid or otherwise to dissipate its assets the recovery thereof, it would seem, should be by or for the corporation. Also, we think the

corporation would have a right to be heard, not only as to whether or not it should have paid operating expenses, including salaries to its officers and other employees, but as to the reasonableness of such expenses.

The circuit court found on this issue:

"The corporation is not a party defendant to the suit. It is a separate entity and irrespective of the fact that it may be the foundation for all of this litigation, nevertheless, in order that a court of equity make any orders, it should be a party to the suit. Furthermore, there are those other than the beneficiaries of the income from the earnings of the corporation who might be interested in an outcome affecting the corporation or its affairs. The corporation is not a party to this proceeding. It has not been brought in. The cause of action, if any, is in the corporation. Since it is not a party, the questions as to payment of salary or remuneration for extraordinary service cannot be considered. The corporation is an indispensable party in such issues." (Citing the authorities we have cited above.) We agree with that conclusion.

We have carefully considered the numerous contentions advanced by the several appellants herein and are of the opinion that the judgment of the circuit court should be affirmed. It is so ordered. *Westhues* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.