Patricia Leonard HILLYARD (now Bowlin), Barbara Leonard Pipher, and Robert S. Leonard, Jr., Respondents,

v.

Gordon McLeish LEONARD and Arthur H. Leonard, Trustees of the George E. Leonard Land Trust, and the Leonard Land Company, a Missouri corporation, Appellants.

No. 50705.

Supreme Court of Missouri,

Division No. 2.

May 10, 1965.

Motions for Rehearing or for Transfer to Court En Banc Denied June 14, 1965.

---

Paul Van Osdol, Jr., Richard M. Erickson, Terrell, Hess, Van Osdol & Magruder, of counsel, Kansas City, for respondents.

Gordon McLeish Leonard, in pro per.

Robert B. Langworthy, Linde, Thomson, VanDyke, Fairchild & Langworthy, Kansas City, for appellants Leonard Land Co. and Arthur H. Leonard.

PRITCHARD, Commissioner.

The trustees of a 1932 inter vivos trust, the principal asset of which on its termination date, December 31, 1950, was a business building situated on real estate in West Kansas City, Missouri, formed a corporation to which the real estate was transferred in exchange for all of the capital stock of the corporation. The stock was then distributed by the trustees to all beneficiaries in accordance with their interests in the trust. Plaintiffs' shares were later purchased by the trustees, except 75 common shares of Patricia Leonard Bowlin. The 1932 trust provided specifically that the trustees should on the termination date set aside a sufficient portion of the trust

property to insure the continuation of the payment of $150.00 per month to the grantor's widow for her lifetime. The widow, Mrs. Harriet M. Leonard, died on April 11, 1959, after which this suit was filed.

Plaintiffs are the three children of a deceased son, Robert Souter Leonard, who died in 1947 and who was one of six original beneficiaries of the 1932 trust. They ask for a declaratory judgment of the interests of the beneficiaries of the trust. Plaintiffs' basic theory is that there was no power in the trustees without plaintiffs' consent, which was not given, to convert the real estate assets of the trust into corporate assets; that the distribution of corporate stock to all beneficiaries of the trust in proportion to their respective interests therein (the corporation having agreed to pay the widow her monthly income for her lifetime) did not constitute a distribution of the trust assets on its specific termination date; and that by reason thereof, the trust did not cease. Plaintiffs say the fiduciary obligations of fair dealing continued after formation of the corporation, and that the trustees had no right to acquire the corporate stock issued to plaintiffs without full disclosure of its actual value.

Plaintiffs' prayer was for an accounting and damages by reason of defendants' failure to make distribution and failure to fulfill their fiduciary obligations, and to surcharge the individual defendants therefor in the amount of money by which defendants failed to pay plaintiffs the true and pro rata value of their shares in the Leonard Land Company. There was a further prayer for attorneys' fees and expenses and that such sums be charged against the proceeds and corpus of the trust.

Defendants' claim is that the transfer of the real estate of the trust to the corporation in exchange for its shares was valid and did terminate the trust; and was the only method by which the trust could be terminated in view of the provision to pay the widow her lifetime income. Defendants pleaded waiver, estoppel, ratification and laches as barring plaintiffs' claim. Defendants also pleaded, and here contend, that plaintiffs forfeited their rights in the trust by bringing this suit contrary to a "no contest" clause in the trust instrument. A counterclaim was asserted against plaintiff Patricia Leonard Hillyard (now Bowlin) for specific performance of an alleged contract to sell her remaining common stock to the corporation.

The trial court's decree covered the following matters, and complete findings of fact were made: The formation of the corporation and the exchange and transfer of trust assets for its capital stock, in turn distributed to the trust beneficiaries, did not terminate the trust or release the defendant trustees from their obligations to plaintiffs, who did not consent to the transfer; that said transaction was not a sale within the terms of the trust agreement, and that plaintiffs put defendants on notice of their objections to such transfer, and have not waived their right to object to the trustees' actions in these respects; that the trust did not terminate until the death of the widow on April 11, 1959, when the obligation to pay her $150.00 per month ended, and that it then became the duty of the trustees to terminate the trust and to render a final accounting to plaintiffs; that plaintiffs did not waive (nor are they estopped from asserting) their right to their full share of the trust assets by endorsing and delivering certain of the shares of the corporation which had been issued to them; that the evidence before the court was insufficient for a determination of the value of the plaintiffs' interests, and the trustees were ordered to render a final account; and the counterclaims (against all three plaintiffs and separately against Patricia Leonard Hillyard) of defendant Leonard Land Company were denied.

The matters covered in the decree were ordered to be final for purposes of appeal, but jurisdiction was retained for the purpose of determining and approving the trus-

tees' final account; whether they have permitted or suffered a loss or losses to the assets of the trust; and a determination of whether plaintiffs shall be entitled to attorneys' fees payable from the corpus of the trust.

Defendants have appealed from the decree against them on plaintiffs' claim, and defendant Leonard Land Company appealed on the decree against it upon its counterclaim for specific performance of a contract to sell her stock against Patricia Leonard Hillyard (now Bowlin). The realty of the corporation, claimed still to be in trust, was appraised at the trial at $197,500. Plaintiffs claim they are entitled to ⅙ of that amount, which, with a proper accounting and distribution by the trustees, will be in excess of $30,000. For their preferred and common stock plaintiffs were paid $9,500. The difference in these amounts exceeds $15,000, hence our appellate jurisdiction. Const.Mo.1945, Art. V, § 3, V.A.M.S.

■ Our review in this suit for declaratory judgment is in nature de novo, as in other equity cases, by which we rule both upon the law and the evidence, but also by which we give due deference to the findings of the trial court where the credibility of witnesses and the weight of the testimony are involved. Mashak v. Poelker, Mo.App., 356 S.W.2d 713, 715 [1, 2]; J. E. Blank, Inc. v. Lennox Land Co., 351 Mo. 932, 174 S.W.2d 862, 865 [1, 2].

By a written trust instrument dated January 2, 1932, grantor, George E. Leonard, conveyed in trust certain property (including real estate here in question) to Robert Souter Leonard, George Edward Leonard and Gordon McLeish Leonard, for the benefit of grantor's six beneficiaries: Robert Souter Leonard; Dixie Lee Moore (now Peterson); George Edward Leonard, Jr.; Tracy Aikin Leonard; Gordon McLeish Leonard; and Arthur Hoyt Leonard, to whom the net income was to be paid during the life of each of them in convenient installments. All of said persons are sons of grantor, except Dixie Lee Peterson who is a granddaughter. It was first provided (Article VI of the trust instrument) that the trustees should pay to grantor's widow, Harriet McLeish Leonard, $150.00 per month for her lifetime. Further provisions of the trust instrument as are here pertinent are as follows: In Article III it was provided, " * * * In the event that it shall become expedient or necessary to sell, convey, mortgage, pledge or otherwise encumber said property, or any part thereof the Trustees shall first obtain the written consent of ROBERT SOUTER LEONARD, if he shall then be living and be capable of giving a valid consent, and the written consent of a majority of the other then living sons of the Grantor to such proposed sale or mortgage, and upon obtaining such written consent, the Trustees shall have full power to sell, convey, mortgage, pledge or otherwise encumber said property. * * * The Trustees shall have power to invest and reinvest the trust property in bonds, notes, secured and unsecured, or in any other income producing property or securities, or undivided interests therein; to make distributions or divisions of any personal property in the trust estate in kind at valuations determined by the Trustees; * * *." By Article V it was provided:

"The interest of any of the beneficiaries hereunder in the trust estate or net income thereof shall consist solely of the right to receive any distributions of the trust estate, including principal, income and proceeds, all of which shall be and be considered and deemed to be personal property. In the event that any beneficiary hereunder shall institute or cause to be instituted any action against the trust estate, or any part thereof, for the partition or division of said trust estate, all rights and interest of such beneficiary shall upon the exhibition or filing of such complaint or petition im-

mediately cease and terminate and the share or interest of such beneficiary shall thereupon be distributed as if said beneficiary had at that time died unmarried and without issue."

By Article VII of the trust instrument, among other things, it was provided:

"In the event that the wife of the Grantor shall on December 31, A.D. 1950, be still living, a sum deemed by the Trustees to be sufficient shall be set aside from the principal of the estate to provide for the payment to her of the sum of One Hundred Fifty Dollars ($150.00) per month for the balance of her life. Such provision shall be made before any other beneficiaries hereunder shall receive any distribution of the principal of the trust estate. On the 31st day of December, A.D. 1950, the Trustees shall divide the principal of the trust estate hereunder, as then constituted, and distribute the same among the persons who shall be at that time entitled to receive the net income under the terms hereof, in the same proportion as such beneficiaries shall be entitled at that time to receive the net income under the terms hereof, * * *."

Shortly prior to the specified termination date of the trust, the trustees were the defendants Gordon M. Leonard, Arthur H. Leonard (and George E. Leonard, Jr., who defaulted in making answer to plaintiffs' petition). Aside from a small amount of personal property, the asset of the trust then consisted of the building and land at 2800 Mercier Street, Kansas City, Missouri. It was then appraised by the Cecil F. Shopen Realty Company at the request of plaintiffs' counsel at $108,000 actual market value.

A few weeks prior to December 31, 1950, it appeared to the then acting trustees that it would be impossible to divide the real estate among the income beneficiaries so as to provide the widow her lifetime income, and a determination was made that all of the assets as of December 31, 1950, would be required to be set aside to assure continued payments to the widow. Investigation was made as to the purchase of an annuity sufficient in amount to provide such income, and it was found that the cost would be in excess of $19,000, which the trustees rejected. No consent to a sale of the real estate to outside interests not connected with the family could be obtained from a majority of the sons of the grantor. A majority of such trustees and sons did, however, consent to the transfer, hereinafter mentioned, of the real estate to the newly formed Leonard Land Company.

The trustees, being faced with the termination date of the trust and the obligation to pay to the widow, Mrs. Harriet M. Leonard, her lifetime income, consulted counsel and were advised that a solution to the problem of a sale of the trust assets and the necessity of setting a sufficient amount of the proceeds of the trust to insure the widow's income would be that a corporation could be formed to take over the assets of the trust and issue its capital stock therefor, and that the corporation would assume the obligation to pay the widow's income for her lifetime. The corporation, Leonard Land Company, was organized by the trustees in December, 1950, with the written approval of ⅝ths of the beneficiaries of the trust, and of Mrs. Harriet M. Leonard. Two of the plaintiffs, Robert and Patricia Leonard, by letter of their counsel, objected on December 18, 1950, and again on December 27, 1950, to the incorporation of the trust, and recommended to the trustees that a fair distribution of the trust assets be made. On May 3, 1951, counsel by letter advised the trustees that they were not in a position, or wished, to institute a suit for distribution, but advised that at such time that the trustees did make actual distribution to the beneficiaries, Robert and Patricia would be each entitled to at least ⅟₁₈th of the appraised value of the assets as of December 31, 1950, plus a reasonable income covering the period of time to distribution, less

their pro rata share of amounts paid the widow as her income; and that they did not concur in continuance of the trust through the device of a corporation, but were advised to accept dividends received until such time the trustees made distribution. The First National Bank of Kansas City, Missouri, Guardian and Curator of Barbara Leonard's estate, she being then a minor, was consulted by Mr. Gordon Leonard, with respect to the incorporation of the trust assets, but it does not appear whether its approval to the transaction was given.

The tenant of the trust realty since 1932 was the National Manufacturing Company. Plaintiffs have no interests in that company, but its corporate stock is owned and controlled by defendants, Gordon, Arthur, George E., and Tracy Leonard, and members of their families for whom certain shares are held in trust. In December, 1950, a written lease was executed to the National Manufacturing Company by the trustees; and on January 1, 1952, a new written lease was made by the Leonard Land Company to the National Manufacturing Company, whereby the rental was increased from $800 per month to a minimum of $19,200 per year, with additional rentals computed upon 1% of all sales, and by which lessee agreed to repair the premises. The rental paid over the years is the sole source of income of the Leonard Land Company. After January 1, 1951, the officers of Leonard Land Company negotiated on behalf of the Land Trust and in lieu of the trustees with the National Manufacturing Company.

In June of 1951, the property was inundated by 15 feet of water from the Kansas City flood. As a result, no 6% dividends were paid for about two years on the preferred stock. (No common stock dividends were ever paid.) The directors of the Leonard Land Company obtained from the Prudential Insurance Company a $100,000 fifteen-year loan which was used in repairing the property, and in making additions thereto. Thereafter, the rental income was partially used to pay the loan, although the widow was always paid her monthly income. George E. Leonard objected unsuccessfully to prepaying the loan instead of paying common stock dividends upon the ground that such was not in the interest of shareholders. The first 36 of the installments were paid on the due date; when No. 36 was paid 31 additional monthly installments were paid; in February, 1957—8 installments were paid; in February, 1958—8 installments were paid; in July, 1959—$4,905 was paid; on July 22, 1950—8 installments, including the one due, were paid; in September, 1960—4 installments were paid, including the one then due; and in March or April, 1961, the balance of 6 installments was paid. In December of 1951, the Leonard Land Company, and Gordon, George E., Arthur and Tracy Leonard individually agreed to indemnify the McDaniel Title Company for any foreclosure loss or claim by any beneficiary of the Land Trust, in consideration of the issuance of a title insurance policy by the Title Insurance Company of Minnesota in connection with the Prudential loan.

At various times offers to purchase shares were made to plaintiffs and other shareholders. On April 25, 1953, an undisclosed offer was made to purchase 100 preferred shares at par value, $100 each, and 250 common shares at $20 each. On October 17, 1953, the corporation offered to purchase its stock at $10 per share common, and $100 per share preferred. On May 11, 1954, Gordon Leonard offered plaintiffs, Robert S. and Patricia Leonard, $30 per share for their common stock. In the letter to them, he stated that the book value of the stock was $10 per share "although the actual value of the stock is dependent on the value of the real estate, which is its principal asset." The letter did not state what the real estate value was, but did state that the current mortgage was approximately $89,000. On July 24, 1958, by letter to plaintiffs' mother, Gordon offered $11 per share for their stock. Arthur also offered Patricia $22 per share for her stock.

The number of shares owned by each plaintiff was 50 original issue, and 75 additional "stock split" issue in consideration of their transfer of their interests in some Taney County land to the Leonard Land Company in 1958. During all times prior to the sale of their shares plaintiffs' mother was given copies of the annual operating statements and balance sheets of the corporation. Plaintiffs Robert S. Leonard and Barbara Leonard Pipher could not recall having received any operating statements or balance sheets of the corporation. At no time, however, were plaintiffs advised of the actual market value of the corporation's realty, or the actual market value of their shares of stock.

Robert S. Leonard, Jr., was the first to sell his shares to Gordon. The evidence conflicts as to who contacted whom with an offer to sell or buy. Gordon testified Robert contacted him, and he paid what he asked, $15 per share, in 1959. Robert testified he was informed that "they" were interested in buying his shares through his mother, who in turn passed along to Gordon that he was interested in selling under his financial circumstances at the time. Gordon testified further that Robert did not ask him what the actual value of the stock was, and:

"Q. Did you consider at the time you were paying the $15 for Robert's stock that that was a fair price to him?

"A. He is a big boy, he is grown up. If he wanted to sell the stock for $15, I was willing to pay $15 for it.

"Q. You were dealing at arm's length?

"A. Correct.

"Q. You weren't considering what was good for Bob?

"A. As I say, he is of age.

"Q. I am asking you if you were protecting the interest of Bob at the time or if you were interested in seeing if you could pick up the shares at the cheapest price you could get? What was your idea?

"A. My main idea in buying the stock was he needed the money, he wanted to sell it, I had the money and I was interested in getting the company on a cooperative basis, which it had not been exactly."

With respect to an offer to purchase Patricia's remaining 75 shares which she still holds, Gordon testified that he authorized the Leonard Land Company to offer her $25 per share, which he considered to be excessive and a "nuisance value." He did not consider the market value of the corporate assets in the offer, but only the book value, about $15, at which the stock had been traded shortly before. He thought that acquiring Patricia's 75 shares was in the company's best interest. He was dealing with all plaintiffs at arm's length, and at the time he felt no obligation to see that plaintiffs got fair value. He was dealing primarily for himself and incidentally for the benefit of the family enterprises, both corporate and otherwise.

Arthur H. Leonard testified that he is the Vice President of Leonard Land Company. He purchased 75 shares of common stock from Florence Leonard (received by her for her deed to the Taney County land in 1958), and a smaller number of shares from one of the children, acting for himself and as an unpaid agent for and on behalf of Tracy and Ruth Leonard. He contacted Florence Leonard for the purpose of purchasing some shares from Barbara, which he bought in 1959 at $15 per share. He indicated to plaintiffs' counsel that plaintiffs have had all they were entitled to from the Leonard family.

Robert S. Leonard, Jr., testified that he did not know what the assets of the Land

Trust were; but he knew that the Leonard Land Company was carrying as a part of its assets the land and building at 2800 Mercier Street and the Taney County property. He received initially 50 shares of common and 20 shares of preferred stock in 1950; and he signed a deed to the Taney County land and received an additional 75 shares of common stock in 1958. He did not consult with counsel in regard to the Land Trust until 1959, although counsel represented him through his mother. He made no statements to either Gordon or Arthur expressing dissatisfaction with the price of his shares, and neither made any representations as to the stock value; he did not ask for information about the company or ask to see its books; but he did not know whether the sale was for less than value.

The preferred shares of Barbara were sold by order of the Probate Court at par value, the common shares being ordered retained. After she reached her majority she sold her shares to defendants through her mother, who made no inquiry as to their value. Barbara knew about the forfeiture provision of the trust instrument. She did not know what the difference was between actual and book value of the stock, nor did she ask defendants as to that. None of her uncles got in touch with her directly concerning the sale of her stock.

Patricia asked Arthur Leonard in December, 1958, what the situation was with regard to the company, and tried to get from him some advice as to whether she should sell the stock or if the $15 per share paid her was the right price. Arthur told her only that there was quite a bit of mortgage to pay and it would probably be years before the Taney County property would be worth anything. She made no complaint about the way the Leonard Land Company was being handled; she didn't try to sell her stock to anyone outside the family; she had no way of knowing what the stock was worth; and asked only Arthur Leonard what the situation was.

Each of plaintiffs, after the initial objection to the incorporation of the Land Trust, accepted their common and preferred shares, and the dividend checks on the latter. They relinquished their interests in the Taney County land by deed and accepted the additional common shares therefor. They made no direct complaint to any defendants about the management of the corporation. They executed waivers of notices of meetings and proxies for annual and special meetings of the corporation.

Realtor, Charles J. Schmelzer, appraised the market value of property of the corporation, 2800 Mercier, by the following methods and at the following figures: Summation method, $204,330; capitalization method, $187,000; and comparables on land value, $197,500. It was stipulated that Elven Akers, Branson, Missouri, would testify that the Taney County land, 504.83 acres, has a value of $32,500.

The trustees never made any charge for, nor were they compensated by cash payment for, their services. Bookkeeping services were provided by personnel of the National Manufacturing Company, where office space was used by the trustees. From 1951 through 1960, a total of $20,638.94 federal income tax and $924.66 state income tax (through 1959) was paid by the Leonard Land Company.

Defendants' first point is that the trial court erred in determining that the distribution of the stock in the corporate defendant to the income beneficiaries did not constitute a full and complete distribution of the trust assets within the meaning of the trust instruments, and in finding that the individual defendants were not thereby discharged as trustees with reference to plaintiffs.

The argument proceeds that the trust instrument clearly provides that with the written consent of a majority of the sons of grantor, the trustees have full power to sell, convey, mortgage or otherwise encum-

ber the trust property. Such consent was obtained and the trustees did sell and convey the trust property to the corporate defendant. Say the defendants further: The trust instrument does not contain any restriction upon what person or corporation may be purchaser of the property; that the trust instrument provides that the trustees may hold the real estate and deal with the property and every part thereof in all other ways and for such considerations as it would be lawful for any person owning the same to deal with the same, except as limited by the instrument, at any time or times thereafter; that the trustees have the power to invest and reinvest the trust property in income producing property or securities; and that the sole interest of the beneficiaries shall be the right to receive any distributions of the trust estate, including principal, income and proceeds, all of which shall be and be considered and deemed to be personal property.

■ We hold first that the trustees in their discretion had the power under the instrument to set aside and withhold the entire trust property to insure that the principal purpose of the trust would be carried out: the payment to grantor's widow her specified income of $150 per month for her lifetime. In view of that provision, and since the widow was still living on the termination date, it was proper for the trustees to arrange for the continuation of her income. It was, however, the duty of the trustees to preserve and protect the corpus of the trust in the interest of all the beneficiaries. Vest v. Bialson, 365 Mo. 1103, 293 S.W.2d 369, 380 [12, 13]. The question then becomes whether or not the trustees had power to incorporate the trust, and flowing from that, were the interests of plaintiffs thus preserved and protected; and was the distribution of shares of stock to plaintiffs a proper distribution of their interests in the corpus of the trust such as would discharge the trustees from further accountability?

■ The transfer of the trust realty to the corporation in exchange for its corporate stock was not a *sale* within the ordinary, usual meaning of that term. In the case of In Re Frank's Estate, Sur.Ct., 154 Misc. 472, 277 N.Y.S. 573, a majority of remaindermen caused a corporation to be formed for the control and management of their interests which had vested in possession after the deaths of six of the seven life tenants. The trustee sought the approval of the court to transfer to the corporation his $\frac{1}{7}$ legal title, and one owner of fractional fee and remainder interests declined to assign her interest to the corporation with the other majority fee owners. The will provided: "I authorize said executors to sell all or any part of my said real estate, at public or private sale, and to give good and sufficient deeds therefor. * * * I direct said executors to invest the funds to be held in trust by them as above directed in productive real estate, or upon Bonds and Mortgages, or in Stocks of the United States, or of the Cities of New York or Brooklyn." The court denied the transfer authority to the trustee, and at loc. cit. 277 N.Y.S. 575 [2] quoted Bouvier's Law Dictionary (Baldwin's Rev.), p. 1082, as defining "a 'sale' as 'an agreement by which one of two contracting parties, called the seller, gives a thing and passes title to it, in exchange for a certain price in current money, to the other party, who is called the buyer or purchaser; who, on his part, agrees to pay such price.'" The court there also quoted 55 C.J. 36 [see 77 C.J.S. Sales, § 1, p. 575], "'Sale' in legal nomenclature, is a term of precise legal import, both at law and in equity, and has a well defined legal signification, and has been said to mean, at all times, a contract between parties to give and to pass rights of property *for money*, which the buyer pays or promises to pay to the seller for the thing bought or sold." (Our emphasis.) See also, for such definition, Freund Motor Co. v. Alma Realty & Investment Co., 235 Mo.App. 587, 142 S.W. 2d 793, 795 [1–3]. The trial court was correct, under the above definitions, in ruling

that the instant transaction was not a sale, and defendants' Point V challenging said ruling is overruled.

We look to the trust instrument, as must the trustees, to ascertain if there was any intent upon the part of the grantor to authorize his trustees to incorporate the trust and make distribution thereof by issuance of corporate shares, and their powers in connection therewith. Loud v. St. Louis Union Trust Co., 313 Mo. 552, 281 S.W. 744, 754 [2]. The grantor refers to the property of the trust as real estate, and gives his trustees full power to protect, control, manage, improve the same. The written consent of a majority of grantor's sons and trustees is required for a sale or mortgage of the property; the trustees shall have full power to purchase or hold real estate, improved or unimproved, and "to deal with said property and every part thereof in all other ways and for such other considerations as it would be lawful for any person owning the same to deal with same, except as herein limited, at any time or times hereafter. The Trustees shall have power to invest and reinvest the trust property in bonds, notes, secured and unsecured, or in any other income producing property or securities; * * *." This trust specifically provides that it is for the benefit of grantor's wife and family and to provide for the well-being of their children and grandchildren (including plaintiffs). The real property transferred to the trust by grantor was occupied by the business, National Manufacturing Company, which was operated by grantor and after his death, four of the beneficiaries of the trust, excepting plaintiffs.

Defendants say that the phrase "to deal with said property and every part thereof in all other ways and for such other considerations as it would be lawful for any person owning the same to deal with same" gives them full power to incorporate the trust and distribute to beneficiaries the capital stock of the corporation. They cite Rohne v. Horton, 180 Wash. 428, 432, 40 P. 2d 134, 135. In that case testator left in trust a New York building and a Seattle building for his trustees to hold, sell or distribute, "with full and ample power, authority and discretion, *as I would have if living*, to hold, control and to manage, to bargain, sell, convey, mortgage, lease or otherwise manage, control, dispose of, settle and distribute the same * * * at such times and for such prices as in their best judgment shall be deemed for the best interests of my estate, beneficiaries and legatees; * * *." (Our emphasis.) Prior to 1905, conditions caused the executors and trustees to consider that a corporation should be organized to take over the title to the above properties, to which *the chief beneficiaries and the residuaries then in existence assented*. The court held that the organization of the corporation to take over the properties was valid, that the testator gave to his executors and trustees ample powers and discretion, and which the testator made stronger by prescribing that they should have the same power as he himself would have (to incorporate the properties). Although the phrase in the Rohne case, "as I would have if living," is similar to the instant trust phrase, "as it would be lawful for any person owning the same to deal with same," yet it is apparent and distinguishing that the powers granted in the Rohne case are much broader than here, and there was also evidence that testator left a letter in which he stated that the incorporation of the assets might be advisable. Also, all beneficiaries in existence in the Rohne case assented to the incorporation, while here the plaintiffs definitely objected; and there was no evidence that any of the beneficiaries had been damaged in the Rohne case, which is not the fact in the case at bar.

Defendants cite also the case of In re Sprague, 22 R.I. 413, 48 A. 383. That case may be distinguished from this one at bar in that the plan suggested to transfer trust property to a corporation, though in form a sale, was really a transfer of title to a corporation for the *purpose of convenience* in making sales and in managing the prop-

erty (here the purpose of the incorporation was concededly for distribution and termination of the trust). In the Sprague case, the powers of trustees were enlarged by statutes on the subject, and there was no objecting beneficiary nor was there any evidence of affecting or changing interests. See also Branch v. DeWolf, 28 R.I. 542, 68 A. 543, where it was held that it was not necessary to determine that the trustees had the power under the will to sell personal property or to invest or change investment because under the statute involved (also in Sprague, supra) the trustees could apply to the superior court from time to time for authority to invest proceeds. There is no applicable statute governing powers of trustees in the situation which we have here, and the trustees did not apply to a court of equity for any determination of their powers prior to incorporation and purported distribution.

Regardless, however, of the relevancy of the holdings in the foregoing cases, there is one controlling precedent in this state: Garesche et al. v. Levering Inv. Co. et al., 146 Mo. 436, 48 S.W. 653, cited and relied upon by plaintiffs. In that case, a will gave the trustees power to manage the estate, and to sell the property or in any other way to dispose of it, and to reinvest it, during the life of the testator's wife, and directed a distribution among remaindermen at her death. Pending the administration the Levering Investment Company was formed, and its board of directors purchased from the trustees practically all of the property (mostly realty) in the estate, for which 3,000 shares were issued to the trustees. The executors of the estate made final settlement and turned over the stock to themselves as trustees, and were discharged as executors. After the widow's death, the shares were distributed to the remaindermen, after certain deductions in cash and in stock to Whittemore for compensation as trustee. Plaintiffs sued to divest title out of the Levering Company and vest it in the devisees under the will, and for an accounting. The trustees contended the

transaction of incorporation was to prevent and avoid the expense of partition of the property, and to preserve the estate intact, and prevent a sacrifice of the property at a public partition sale; and that it was done in good faith, under advice of counsel (as here). The court said, loc. cit. 48 S.W. 656, "Yet the case is not dependent upon any of these considerations. It is a question of the power of the executors and trustees under the terms of the Levering will—of whether the power to sell and reinvest gives the authority to the executors and trustees to incorporate the estate. If there is no such power conferred by the will, the bona fides of the executors and trustees, and the benefits accrued to the trust property, cannot justify the proceeding. The will itself nowhere gives any intimation of any such idea in the mind of the testator. He provided for his wife for life, and after her death directed the remainder of his property, 'real, personal, and mixed, to be equally distributed among my daughter, Kate Whittemore, and our grandchildren, share and share alike.' This language cannot impart the idea that the trust estate was to be changed in character, and converted into a corporation, and the shares of stock distributed. The corporation is organized for a duration of 50 years. The Whittemore branch of the devisees controlled about two-thirds of the stock; the Levering share comprising only one-third. When Levering directed that upon the death of his wife the property remaining, 'real, personal, and mixed,' should be distributed among the devisees share and share alike, he cannot fairly be said to have intended that the Leverings should become minority stockholders in a corporation that was to hold the property he left for 50 years, and that those devisees were only to have the benefit of his devise whenever the majority of the stockholders chose to declare dividends, nor that the management of the interests bequeathed to the Leverings should be, in the hands of the Whittemores, exercised by a majority vote of the stock, and executively attended to by the officers, who

were the Whittemore devisees. * * * The executors and trustees were clothed with power over the property only until the termination of the life estate. Then the trust ceased. They were not authorized to prolong their tenure of office."

■ There are striking similarities between the case now before the court and the Garesche case. It is true that here the trustees were authorized to continue the trust (i. e., set aside sufficient property) to insure income to grantor's widow after the specific termination date (December 31, 1950) should she still be living. There would, however, have to be a final distribution of any amount of property so set aside upon the widow's death. We have held that the trustees were justified, in their determination, to withhold or set aside the entire trust property to provide the widow her income. We hold that they were not authorized to incorporate the trust and make a final stock distribution in lieu of trust assets over the objection of these plaintiffs. The interest of these plaintiffs was converted into minority stock, the dividends upon which were controlled by adverse majority interests in the Leonard Land Company. Such interests were tied up for the duration of the corporation. At the death of Mrs. Leonard, these plaintiffs were deprived of their right to immediate liquidation of their interests in the trust, and were at the mercy of the majority stockholders with respect to such liquidation and income from dividends in this close family corporation. Garesche, supra; Williams et al. v. Schmitt et al., 16 F.Supp. 422. See also 2 Scott on Trusts, § 190.9A, p. 1441. Plaintiffs' rights are determined by the trust instrument and not by the charter of the corporation. Wallace v. Julier, 147 Fla. 420, 3 So.2d 711. Undoubtedly the grantor meant by the provision that the trustees may hold the real estate and deal with the property "as it would be lawful for any person owning the same to deal with same" that the trustees should be unfettered with respect to the management of such real estate—the principal and necessary asset of the estate for the continuation of the National Manufacturing Company, the family business. If it became necessary to sell the real estate, by the consent of the majority of trustees and sons, there is no indication that grantor intended that plaintiffs, his grandchildren, would have their interests tied up in a corporation of uncertain duration. A reinvestment of sale proceeds is required to be in safe, unspeculative investments, with safety the first and production of income the second consideration. Sebree v. Rosen, Mo., 349 S.W. 2d 865, 889. In this situation the trust corpus may have been at all times kept intact, yet it could not have been grantor's intention that plaintiffs would be limited to the fixed income on their preferred stock, but after payment of the widow's income they should have been additionally entitled to share in the net profits (rents) from the assets of the trust. Instead of paying dividends on common stock, defendants used the income of the corporation to prepay the Prudential Insurance Company loan to the augmentation of the value of their shares, and without informing plaintiffs of the effect thereof.

■ The trust did not cease upon incorporation of the trust assets and distribution of the capital stock to the income beneficiaries of the trust. "Such corporation thereupon became the alter ego of the trustees and as such the propriety of its acts must be determined in the light of the will and must be controlled by the provisions of the will of the decedent." Wallace v. Julier, supra, loc. cit. 3 So.2d 715. The proportionate corporate shares here stood in the place of plaintiffs' interests (⅛ each) in the Land Trust. The defendant trustees' fiduciary duties continued, among which was to make distribution of the trust estate, *as then constituted* (December 31, 1950) at the death of grantor's widow or within a reasonable time thereafter. One other and most important fiduciary duty of these trustees was to deal fairly with plaintiff beneficiaries. That included a complete disclosure of the true value of plaintiffs' in-

terests in the corporation, their stock in which having been acquired by the trustees. "While such transactions are scrutinized closely by the courts, there is nothing to prevent a trustee from purchasing trust property from a beneficiary, *if he can show the transaction was open, fair and above board*, and that the beneficiary was sui juris, *informed* and consented, the burden being on the trustee to establish these facts." (Emphasis ours.) Kuhn v. Zepp, 355 Mo. 295, 196 S.W.2d 249, 253 [5]; Bilton v. Lindell Towers Apartments, 358 Mo. 209, 213 S.W.2d 952, 958 [1–3]. The trustee owes undivided loyalty to his trust and to the beneficiaries thereof; he is to act exclusively in their interest and refrain from engaging in self dealing. 54 Am.Jur. Trusts, § 453, p. 359. See also 90 C.J.S. Trusts § 303, p. 471 et seq. In this case, the trust having continued after the incorporation of its assets, and the purchase by at least two of the trustees of plaintiffs' shares having been shown, defendants have not satisfied their burden of proving that the transactions were fair and were free of self dealing. The evidence indicates that by reason of the true value of the real estate of the corporation plaintiffs were not paid the true value of their interests therein; clearly they were not informed thereof, but were dealt with at arm's length; and at one point, one of the trustees indicated to plaintiffs' counsel that plaintiffs had gotten all that they were going to get from the Leonard family and that the shares of one plaintiff had only a "nuisance value." In view of the express provision that this trust was for the benefit of grantor's grandchildren, such statements showed an adverse interest and animosity, contrary to what the law imposes upon a fiduciary trustee as his duty toward a beneficiary. Defendants' Point I is ruled against them.

By Point II defendants contend that plaintiffs' conduct over the years precludes them from maintaining this action (waiver, estoppel, ratification and laches). The conduct relied upon is (a) Receiving and receipting for stock certificates as a distribution; (b) Executing waivers of notice of stockholders' meeting; (c) Accepting and cashing dividend checks; (d) Freely and voluntarily selling their shares of corporate stock; (e) Executing deeds to realty inherited from grantor in exchange for additional shares of stock; and (f) Refraining from asserting the claims set out in their petition for 9 years after December 31, 1950.

Two of plaintiffs by letters from their counsel registered their objection to the incorporation prior thereto. They later, on May 3, 1951, voiced further objection and advised the trustees that these two plaintiffs would be entitled to ⅛th interest each in the assets of the trust upon its distribution, plus a reasonable income thereon, less their pro rata charge for the widow's income. We have held that the trustees could continue the trust to insure the widow's income. Because of that fact, and the further fact that the trust instrument provided for forfeiture of their interests upon institution of any action for the partition or division of the trust assets, Robert, Patricia and Barbara (through her guardian, the First National Bank of Kansas City) were not compelled to bring a suit for such division during the life of the widow and thereby hazard a forfeiture of their interests. Such "no contest" provisions are valid. See discussion in Rossi v. Davis, 345 Mo. 362, 133 S.W.2d 363, 367 [1], 125 A.L.R. 1111. They are, however, strictly construed, Cox v. Fisher, Mo., 322 S.W.2d 910, 914 [2–4], but will be enforced where it is clear that the trustor intended that the conduct in question should forfeit a beneficiary's interest under the indenture. Liggett v. Liggett, 341 Mo. 213, 108 S.W.2d 129; 49 A.L.R.2d 198, 203. The two plaintiffs in sui juris, and the bank as guardian of Barbara before she became of age, were justified in their position that their interests might be forfeited if they brought their suit for division prior to the time when that right accrued, i. e., after the death of the widow. There was no waiver or voluntary relinquishment of their rights—on the con-

trary, the trustees were advised that they would continue to be held accountable to plaintiffs. See Sutorius v. Mayor, 350 Mo. 1235, 170 S.W.2d 387, 396, concerning waiver being a matter of intention, here not present. See also 92 C.J.S. Waiver p. 1041, et seq.

■ Nor are plaintiffs estopped from asserting their right to a division after the widow's death. Plaintiffs held nothing out to defendants amounting to any representation, but merely advised them that they were going to continue to insist upon their divisional rights of the trust assets, and defendants knew of that position. Defendants, having equal knowledge, were not misled to their prejudice. Prouse v. Schmidt, Mo., 156 S.W.2d 919; Liese v. Sackbauer, Mo., 222 S.W.2d 84; Taylor v. Farmers Bank of Chariton County, Mo.App., 135 S.W.2d 1108. Yet, defendants proceeded to incorporate the trust assets without the advice of a court of equity, and did so at their peril. The situation is that defendants forced upon plaintiffs, over the objection of two of them, a distribution of corporate stock in lieu of a distribution of trust assets as their share. In view of the "no contest" provision of the trust indenture, the acceptance of the stock, and participation as a shareholder in the corporation was the only route open to plaintiffs. Robert and Patricia, by counsel, advised defendants that their only recourse was to accept and cash whatever dividend checks they might receive, but that they did not concur in the continuance of the trust through the device of a corporation. The fiduciary duties of the trustees continuing, although in the form of a corporation, the transfer of the Taney County land in exchange for corporate shares (in compliance with the proposition therefor by the trustee-directors) was no different than if plaintiffs had deeded that land to the trustees to be held under the continuing trust. In either event, they are entitled to their proportion of all the assets of the corporation, the same as from the original trust. Plain-

tiffs have not ratified the wrongful incorporation of trust assets by their subsequent participation in the corporate activities to the extent mentioned, having initially stated their position with respect to such incorporation, it being in violation of the law under the facts of this case. Atlantic Nat. Bank of Jacksonville, Fla. v. St. Louis Union Trust Co., 357 Mo. 770, 211 S.W.2d 2, 9 [14, 15]; Himmel v. Leimkuehler, Mo. App., 329 S.W.2d 264, 271 [9, 10], and cases cited.

■ Laches is no defense to plaintiffs' action. Because the trustees had the power and authority to continue the trust, withholding of all assets, to insure the widow's income, the cause of action for a proper distribution arose upon her death, as the trial court correctly ruled. The action was timely instituted after the widow's death. See analogous cases upon accrual of causes of action for the recovery of remainder interests: Allen v. De Groodt, 98 Mo. 159, 11 S.W. 240; Bradley v. Goff, 243 Mo. 95, 147 S.W. 1012, 1014 [7]; Tennison v. Walker, Mo., 190 S.W. 9, 11 [1]. Defendants' Point II is overruled.

■ Defendants next contend (Point III) that the court erred in determining that plaintiffs had any interest in the trust assets or income in 1959. The argument is that the trust instrument, Article VII, provides that "In the event of the death of any of the sons of the Grantor herein designated by name prior to the 31st day of December, A.D. 1950, leaving lawful issue him surviving, the part of the net income to which such deceased son had been entitled at the time of his death shall be paid to his surviving lawful issue in equal parts, per stirpes, and not per capita, until the 31st day of December, A.D. 1950." The income of the trust was to be paid to the five sons and granddaughter (Dixie) during the life of them "until the termination of the trust and distribution of the trust estate as hereinafter provided" (December 31, 1950). Defendants say plaintiffs, as the children of

a named beneficiary, son Robert Souter Leonard, were not entitled to receive any income after December 31, 1950. The argument is without merit. Grantor clearly intended to benefit his children *and grandchildren*. Plaintiffs were entitled to the income of the trust *on* December 31, 1950, as surviving lawful issue of their father. The trust provision is that the trustees shall (on that date) divide the principal as then constituted and distribute the same among the persons *who shall be at that time* entitled to receive the net income in the same proportion as such beneficiaries shall be entitled to receive the net income. If such principal shall be payable to a minor, provision was made by Article IX that it should be further held in trust for such minor. Besides, defendants treated plaintiffs as being entitled to a distributive share of principal and income after December 31, 1950, and their answers admit such. They cannot now change their theory and introduce a new unpleaded defense. Point III is overruled.

■ Plaintiffs do not forfeit their rights by bringing this action after the death of the grantor's widow, at which time the beneficiaries of the trust (including plaintiffs) would be entitled to a distribution of the corpus thereof. A principal purpose of the grantor was to see after the well-being of his wife, and, of course, his children and grandchildren during the duration of the trust. The "no contest" forfeiture provision could only have been inserted to protect those purposes while they existed. The grantor could not have meant that any beneficiary would lose his interest if he brought suit to force the trustees to make distribution when he was entitled to it, and when the purpose of the trust would not be thwarted. The objects of the trust were completed upon the death of grantor's widow, April 11, 1959. Thereafter plaintiffs brought this suit for a proper distribution to which they are entitled, and which the trustees were wrongfully withholding. Point IV, raising this issue, is overruled.

Point VI merely, raises the issue that the trial court's order for an accounting was improper *if* this court agree with any of defendants' aforesaid contentions. Because we have not agreed with such contentions, we rule that plaintiffs are entitled to an accounting, including any items of unnecessary or unauthorized expenditures incident to defendants' unauthorized forming of the corporation.

■ With respect to Leonard Land Company's counterclaim against Patricia for specific performance of a contract to sell her stock to it for $25 per share, a total of $1,875 for her remaining 75 shares, the question was one of fact for the trial court as to whether a contract was made. Counsel for defendant Leonard Land Company testified that he wrote Patricia (and the other plaintiffs and stockholders) concerning a proposal to liquidate the corporation to avoid double taxation. In a conversation with her on the telephone, she stated she didn't know whether she wanted to go along with the proposal, but that she would be more interested in selling her 75 shares for $25 per share, and would take that. She gave him her address and telephone number, and he reported the conversation to Gordon Leonard. On June 12, 1959, counsel received a check from Gordon for $1,875 for Patricia's shares, with instructions to complete the transaction. Counsel telephoned Patricia and told her he had the money and was prepared to complete the transaction, and the company was accepting the offer. Counsel did not explain to Patricia as to the value of the assets of the Leonard Land Company. Patricia stated to counsel that she was then dubious as to whether she wanted to go through with the transaction; and that she would not go through with it. Patricia testified that counsel called her and told her he had a check for the shares at $25 per share. She recalled no prior discussions about the shares, nor did she deliver the shares. The evidence thus conflicts as to whether there was an offer to sell and an acceptance

thereof. We defer to the trial court in its finding upon the counterclaim.

The judgments are affirmed and the case is remanded for further proceedings.

BARRETT and STOCKARD, CC., concur.

PER CURIAM:

The foregoing opinion by PRITCHARD C., is adopted as the opinion of the Court.

All of the Judges concur.